1
2
3
4                      **UNITED STATES DISTRICT COURT**
5                           **DISTRICT OF NEVADA**
6                                  * * *
7    GILDARDO ROGELIO ESCOBAR              Case No. 2:25-cv-01872-RFB-EJY
8    SALGADO, *et al*.,
                                                       **ORDER**
9                     Petitioners,
10          v.
11   JOHN MATTOS, *et al*.,
12                    Respondents.
13
14          Petitioners Gildardo Rogelio Escobar-Salgado, Juan Jose Mena-Vargas, and Alejandro
15   Reyes-López have filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241,
16   challenging the lawfulness of their detention at Nevada Southern Detention Center in the custody
17   of Federal Respondents. For the following reasons, the Court grants the Writ for each Petitioner.
18
19   **I.    INTRODUCTION**
20          This case is one of a growing number before this Court challenging the federal
21   government's new policy of mandatory detention of all noncitizens charged with entering the
22   United States without inspection.[1] The policy is based on a new interpretation of the Immigration
23
24          [1] This Court has already granted petitioners relief in thirteen similar challenges. See, e.g.,
25   Herrera v. Knight, No. 2:25-CV-01366-RFB-DJA, 2025 WL 2581792 (D. Nev. Sept. 5, 2025);
     Vazquez v. Feeley, No. 2:25-CV-01542-RFB-EJY, 2025 WL 2676082 (D. Nev. Sept. 17, 2025);
26   Roman v. Noem, No. 2:25-CV-01684-RFB-EJY, 2025 WL 2710211 (D. Nev. Sept. 23, 2025);
     Carlos v. Noem, No. 2:25-CV-01900-RFB-EJY, 2025 WL 2896156 (D. Nev. Oct. 10, 2025); E.C.
27   v. Noem, No. 2:25-CV-01789-RFB-BNW, 2025 WL 2916264 (D. Nev. Oct. 14, 2025); Perez
     Sanchez v. Bernacke, No. 2:25-CV-01921-RFB-MDC (D. Nev. Oct. 17, 2025); Aparicio v. Noem,
28   No. 2:25-CV-01919-RFB-DJA, 2025 WL 2998098 (D. Nev. Oct. 23, 2025); Dominguez-Lara v.

and Nationality Act (INA) by the executive branch, specifically 8 U.S.C. § 1225(b)(2)(A), as requiring the detention of all undocumented individuals during the pendency of their removal proceedings, which can take months or years. According to this interpretation, detention is mandatory no matter how long a noncitizen has resided in the country, and without any due process to ensure the government has a legitimate interest in their detention.

This sweeping new policy, which the Department of Homeland Security (DHS), in conjunction with the Department of Justice (DOJ), adopted on a nationwide basis on July 8, 2025,[2] subjects millions of undocumented residents to prolonged detention without the opportunity for release on bond, in contravention of decades of agency practice and robust due process protections hitherto afforded to such residents under 8 U.S.C. § 1226(a).[3] On September 5, 2025, the Bureau of Immigration Appeals (BIA) issued a precedential decision adopting this new interpretation of the government's detention authority under the INA. See Matter of Yajure Hurtado, 29 I&N Dec. 216 (BIA 2025) ("Hurtado"). After Hurtado, immigration judges no longer have authority to hear bond requests or grant bond to noncitizens present in the U.S. who entered without inspection. Id.

The overwhelming majority of district courts across the country,[4] including this Court, that have considered the government's new statutory interpretation have found it incorrect and unlawful. See Maldonado Vazquez v. Feeley, 2:25-CV-01542-RFB-EJY, 2025 WL 2676082 (D.

Noem, No. 2:25-CV-01553-RFB-EJY, 2025 WL 2998094 (D. Nev. Oct. 24, 2025); Bautista-Avalos v. Bernacke, 2:25-CV-01987-RFB-BNW (D. Nev. Oct 27, 2025); Arce-Cervera v. Noem, No. 2:25-CV-01895-RFB-NJK, 2025 WL 3017866 (D. Nev. Oct. 28, 2025); Alvarado Gonzalez v. Mattos, No. 2:25-CV-01599-RFB-NJK (D. Nev. Oct. 30, 2025); Rodriguez Cabrera v. Mattos, No. 2:25-CV-01551-RFB-EJY, 2025 WL 3072687 (D. Nev. Nov. 3, 2025); Berto Mendez v. Noem, No. 2:25-cv-02602-RFB-MDC (D. Nev. Nov. 7, 2025).

[2] See ICE Memo: Interim Guidance Regarding Detention Authority for Applications for Admission, AILA Doc. No. 25071607 (July 8, 2025), https://perma.cc/5GKM-JYGX.

[3] See Kyle Cheney & Myah Ward, Trump's new detention policy targets millions of immigrants. Judges keep saying its illegal., Politico (Sept. 20, 2025 at 4:00 p.m. EDT), https://www.politico.com/news/2025/09/20/ice-detention-immigration-policy-00573850, https://perma.cc/L686-E97L.

[4] Kyle Cheney, More than 100 judges have ruled against the Trump admin's mandatory detention policy, Politico (Oct. 31, 2025 at 4:29 p.m. EDT), https://www.politico.com/news/2025/10/31/trump-administration-mandatory-detention-deportation-00632086, https://perma.cc/Z8QY-VHXM.

Nev. Sept. 17, 2025) (finding the statutory text and "canons of statutory interpretation, including the legislative history, regulations, and long history of consistent agency practice, as well as the doctrine of constitutional avoidance" demonstrate the government's new reading of § 1225(b)(2)(A) is likely unlawful); see also, e.g., Rodriguez v. Bostock, No. 3:25-CV-05240-TMC, 2025 WL 2782499 (W.D. Wash. Sept. 30, 2025) ("Every district court to address this question has concluded that the government's position belies the statutory text of the INA, canons of statutory interpretation, legislative history, and longstanding agency practice.") (collecting cases).

Petitioners challenge their detention in the custody of Federal Respondents pursuant to this new policy as unlawful under the INA and unconstitutional. For the reasons set forth below, the Court finds that Petitioners are being detained in violation of the INA and the Due Process Clause, and orders habeas relief accordingly.

## II.    BACKGROUND

The following legal framework regarding the government's detention authority and removal proceedings under the INA is relevant to Petitioners' challenge to the lawfulness of their ongoing detention.

### A. Legal Background

#### 1.    Detention Authority Under the INA

The INA generally provides for three forms of civil detention for noncitizens in removal proceedings.

First, 8 U.S.C. § 1226 authorizes the detention of noncitizens arrested "on a warrant" pending the resolution of standard removal proceedings before an IJ. See 8 U.S.C. § 1229a. Standard removal proceedings under § 1229a, the "usual removal process," involve an evidentiary hearing before an immigration judge (IJ). Dep't of Homeland Sec. v. Thuraissigiam, 591 U.S. 103, 108 (2020). Section 1226 provides that while removal proceedings are pending, a noncitizen "on a warrant," "may be arrested and detained" and that the government "may release the alien on bond . . . or conditional parole." 8 U.S.C. § 1226(a)(2); accord Thuraissigiam, 591 U.S. at 108 (during removal proceedings, a noncitizen may either be "detained" or "allowed to reside in this

1  country").

2      "Section 1226 generally governs the process of arresting and detaining . . . [noncitizens]

3  already in the country pending the outcome of removal proceedings," including noncitizens who

4  are "present in the country" despite being "inadmissible at the time of entry." Jennings v.

5  Rodriguez, 583 U.S. 281, 288-89 (2018). "[O]nce inside the United States . . . the default rule" is

6  set forth in § 1226. Id. at 288 (quoting § 1226(a)). Unless they have been arrested, charged with,

7  or convicted of certain enumerated crimes, which would subject them to mandatory detention until

8  their removal proceedings are concluded, see 8 U.S.C. § 1226(c), an individual detained under §

9  1226(a) can be released by ICE on bond or conditional parole. See 8 U.S.C. § 1226(a)(1); 8 C.F.R.

10  § 236.1(c)(8).

11      If release is denied by ICE, the detainee can seek a custody redetermination before an IJ

12  (i.e., bond hearing) at the outset of their detention, see 8 C.F.R. §§ 1003.19(a), 236.1(d). See also

13  Jennings, 583 U.S. at 306 ("Federal regulations provide that aliens detained under § 1226(a)

14  receive bond hearings at the outset of detention.") (citing 8 CFR §§ 236.1(d)(1)). If, at this hearing,

15  the detainee demonstrates by a preponderance of the evidence that he or she is not "a threat to

16  national security, a danger to the community at large, likely to abscond, or otherwise a poor bail

17  risk," the IJ will order his or her release. Rodriguez Diaz v. Garland, 53 F.4th 1189, 1197 (9th Cir.

18  2022) (citing Matter of Guerra, 24 I. & N. Dec. 37, 40 (B.I.A. 2006)). If an IJ has determined the

19  noncitizen should be released, DHS may not re-arrest that noncitizen absent a change in

20  circumstance, such as involvement in the criminal justice system. See Panosyan v. Mayorkas, 854

21  F. App'x 787, 788 (9th Cir. 2021).

22      Second, the INA imposes mandatory detention of noncitizens under 8 U.S.C. § 1225. While

23  "§ 1226 applies to aliens already present in the United States," the INA "authorizes the

24  Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and

25  (b)(2)." Jennings, 583 U.S. at 303 (2018) (emphasis added). Section 1225(b) "supplement[s] §

26  1226's detention scheme." Rodriguez Diaz, 53 F.4th at 1197. Individuals detained under § 1225(b)

27  receive no bond hearing, see 8 U.S.C. § 1225(b)(1)(B)(ii), (iii)(IV), (b)(2)(A), and can only be

28  released under humanitarian parole at the arresting agency's (i.e., ICE) discretion. See Jennings

583 U.S. at 288; 8 U.S.C. § 1192(d)(5).

Under § 1225, a noncitizen "who has not been admitted or who arrives in the United States" is considered "an applicant for admission." 8 U.S.C. § 1225(a)(1). For certain applicants for admission, § 1225 authorizes "expedited removal." § 1225(b)(1). Specifically, "Section 1225(b)(1) applies to aliens initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation," as well as "certain other aliens designated by the Attorney General." Jennings, 583 U.S. at 287 (citing §§ 1225(b)(1)(A)(i), (iii)). Individuals that fall into § 1225(b)(1) are "normally ordered removed 'without further hearing or review' pursuant to an expedited removal process" unless claiming asylum or a fear of persecution. Id. (first quoting § 1225(b)(1)(A)(i), then citing § 1225(b)(1)(A)(ii)).

Section 1225 also contains a provision that applies to applicants for admission not covered by § 1225(b)(1). Jennings, 583 U.S. at 287. This provision, § 1225(b)(2), states that, subject to statutory exceptions, "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2). Thus, noncitizens subject to § 1225(b)(2) are not eligible for expedited removal but are subject to mandatory detention while their standard removal proceedings under § 1229a are pending. This contrasts with the default detention regime under § 1226(a) discussed above, which allows for discretionary release and review of detention through a bond hearing before an immigration court.

Lastly, the INA provides for detention of noncitizens who have been issued a final order of removal. See 8 U.S.C. §§ 1231(a)-(b). That form of detention is not relevant here.

### i. *Legislative History and Agency Practice Regarding §§ 1225 and 1226*

This case concerns the mandatory versus discretionary detention provisions under §§ 1226(a) and 1225(b)(2), which were enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) of 1996, Pub. L. No. 104-208, Div. C, §§ 302–03, 110 Stat. 3009-546, 3009–582 to 3009–583, 3009–585. Section 1226 was most recently amended this year by the Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025).

Until the government adopted its new interpretation of § 1225(b)(2) this year, the longstanding (almost three decades) practice of the agencies charged with interpreting and enforcing the INA since IIRIRA was enacted was to apply § 1226(a) to noncitizens who entered the U.S. without inspection and were apprehended while *present* in the U.S. By contrast, those apprehended at or near a port of entry were designated as "arriving alien(s)." The Executive Office for Immigration Review's (EOIR) regulations drafted to implement the IIRIRA amendments explained this distinction. See Inspection and Expedited Removal of Aliens, 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997) ("Despite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond redetermination . . . . The effect of this change is that inadmissible aliens, *except for arriving aliens*, have available to them bond redetermination hearings before an immigration judge, while *arriving aliens* do not. This procedure maintains the status quo . . .") (emphasis added).

Consistent with that distinction, the regulations define the term "arriving alien" as follows:

> The term arriving alien means an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport.

8 C.F.R. § 1001.1. Accordingly, in the decades since IIRIRA was enacted, DHS and the EOIR have applied § 1226(a) to the detention of individuals apprehended within the continental U.S. who entered without inspection and provided them access to release on bond, while § 1225(b) has been applied to "arriving" noncitizens apprehended in the process of crossing the border.

### 1. The Laken Riley Act

The Laken Riley Act, which was enacted this year, authorized mandatory detention for certain additional categories of noncitizens under § 1226(c). See Pub. L. No. 119-1, 139 Stat. 3 (2025); 8 U.S.C. § 1226(c). Specifically, § 1226(c)(1)(E) (enacted by the Laken Riley Act) requires mandatory detention for people who are charged as being (1) inadmissible under 8 U.S.C. § 1182(a)(6)(A)(i) (the inadmissibility ground for "Aliens present in the United States without being

1    admitted or paroled") or (a)(7) (the inadmissibility ground for lacking a "valid entry document" to

2    enter the U.S.) *and* who (2) have been arrested, charged with, or convicted of certain crimes not

3    relevant here. 8 U.S.C. § 1226(c)(1)(E). The Laken Riley amendments otherwise continue to

4    authorize discretionary detention of noncitizens charged with being inadmissible who do not fall

5    into those enumerated exceptions.

6                    **2.    The Automatic Stay Under 8 C.F.R. § 1003.19(i)(2)**

7         Prior to 2001, detainees subject to discretionary detention under § 1226(a) who were

8    granted bond by an IJ remained detained only if the BIA granted a request to stay the bond order. 8

9    C.F.R. § 1003.19(i)(2) (1998) (permitting the use of automatic stays only where the noncitizen

10   was subject to a mandatory detention statute). In 2001, the Immigration and Naturalization Service

11   (now DHS) implemented an interim rule to expand its authority to issue automatic stays of IJs'

12   custody decisions pending their appeal. See EOIR, Review of Custody Determination, 66 Fed.

13   Reg. 54909, 54910 (Oct. 31, 2001). The INS emphasized that the stay was "a limited measure," to

14   be used only "where the Service determines that it is necessary to invoke the special stay procedure

15   pending appeal." Id.

16        In 2006, the EOIR promulgated the final and current rule, which added the requirement

17   that to preserve the automatic stay, the attorney for DHS must file, with the notice of appeal, a

18   certification by a senior legal official under 8 C.F.R. § 1003.6(c). The certification must state:

19              (i)    the official has approved the filing of the notice of appeal
20                     according to review procedures established by DHS; and

21              (ii)   the official is satisfied that the contentions justifying the
                       continued detention of the alien have evidentiary support,
22                     and the legal arguments are warranted by existing law or by
                       a non-frivolous argument for the extension, modification, or
23                     reversal of existing precedent or the establishment of new
                       precedent.

24   8 C.F.R. §§ 1003.6(c)(1)(i)-(ii). The automatic stay will lapse after ten days if DHS fails to timely

25   file the notice of appeal and certification. Id. The certification requirement was added "to allay

26   possible concerns that in some case the automatic stay might be invoked . . . without an adequate

27   factual or legal basis." See EOIR, Review of Custody Determination, 71 Fed. Reg. 57873, 57876

28   (Oct. 2, 2006).

### 3.    The Government's New Mandatory Detention Policy

On July 8, 2025, DHS issued a notice entitled "Interim Guidance Regarding Detention Authority for Applicants for Admission" to all ICE Employees.[5] The Notice indicated that DHS, in coordination with the Department of Justice, "revisited its legal position" on the INA and determined that § 1225, rather than § 1226, is the applicable immigration authority for any alien present in the United States "who has not been admitted. . . whether or not at a designated port of arrival."[6] Accordingly, "it is the position of DHS that such aliens are subject to [mandatory] detention under INA § 235(b) [8 U.S.C. § 1225(b)] and may not be released from ICE custody except by INA § 212(d)(5) parole."[7] The Notice further provides "[t]hese aliens are also ineligible for a custody redetermination hearing ('bond hearing') before an immigration judge and may not be released for the duration of their removal proceedings absent a parole by DHS. For custody purposes, these aliens are now treated in the same manner that 'arriving aliens' have historically been treated."[8] In sum, this change in in policy deems anyone intercepted in the U.S. and charged with being inadmissible as having entered without inspection subject to mandatory detention under § 1225(b)(2)(A) during removal proceedings under § 1229a. This change deprives noncitizens arrested while living in the country of the due process protections under § 1226(a), including entitlement to a bond hearing and multiple levels of judicial review of an IJ's bond determination. See 8 C.F.R. §§ 1003.19(a), 1236.1(d).

The government's changed position on its authority to detain all undocumented individuals living in the United States was ultimately adopted by the Bureau of Immigration Appeals (BIA). The (BIA) is an appellate body within the Executive Office of Immigration Review (EOIR), which is an administrative agency within the Department of Justice (DOJ). 8 C.F.R. § 1003.1(d)(1).[9] On

---

[5] See ICE Memo: Interim Guidance Regarding Detention Authority for Applications for Admission, AILA Doc. No. 25071607 (July 8, 2025), https://perma.cc/5GKM-JYGX.

[6] Id.

[7] Id.

[8] Id.

[9] The BIA is "charged with the review of those administrative adjudications under the [INA] that the Attorney General may by regulation assign to it." Id. By regulation, the BIA has the authority to review custody determinations by IJs. 8 C.F.R. §§ 236.1(d)(3), 1236.1(d)(3). The BIA

1    September 5, 2025, the BIA issued <u>Hurtado</u>, a precedential decision adopting DHS and the DOJ's

2    new interpretation of § 1225(b)(2)(A). <u>See</u> <u>Matter of Yajure Hurtado</u>, 29 I&N Dec. 216 (BIA

3    2025). <u>Hurtado</u> divested IJs of the authority to consider bond for individuals who entered the

4    country without inspection.

5           Importantly, however, prior to <u>Hurtado</u>, IJs in Las Vegas in various cases rejected DHS's

6    new interpretation of § 1225(b)(2), and instead found jurisdiction under § 1226(a) over noncitizens

7    like Petitioners who were arrested within the U.S., rather than at or near the border, and have

8    resided within the country continuously for longer than two years. <u>See</u>, <u>e.g.</u>, ECF No. 8-1 at 29

9    (order by Las Vegas IJ Glen Baker declining to treat Petitioner as an applicant for admission under

10   DHS's new reading and citing the district court's injunction against that reading in <u>Vazquez v.</u>

11   <u>Bostock</u>, Case No. 3:25-cv-05420-TMC (W.D. Wash. 2022)); <u>Herrera v. Knight</u>, No. 2:25-CV-

12   01366-RFB-DJA, 2025 WL 2581792, at *4 (D. Nev. Sept. 5, 2025) (wherein three separate Las

13   Vegas IJs considered and rejected DHS' statutory interpretation and found jurisdiction over each

14   petitioner under § 1226(a)); <u>Vazquez v. Feeley</u>, No. 2:25-CV-01542-RFB-EJY, 2025 WL

15   2676082, at *3 (D. Nev. Sept. 17, 2025); <u>Aparicio v. Noem</u>, No. 2:25-CV-01919-RFB-DJA, 2025

16   WL 2998098 (D. Nev. Oct. 23, 2025) (noting the automatic stay was being invoked systemically

17   to override the individualized determinations of the Las Vegas Immigration Court that noncitizens

18   should be released on bond). Thus, prior to <u>Hurtado</u>, there are a category of cases in which the IJ's

19   rejected DHS' statutory interpretation and initially granted bond.

20          In response to the rejection of its new interpretation by a majority of IJs in this jurisdiction

21   DHS systemically filed, as it did with Petitioner Escobar-Salgado, a Form EOIR-43 to

22   automatically stay the IJs' bond release orders pending appeal to the BIA, based solely on DHS'

23   new interpretation of § 1225(b)(2). These appeals have not been based on any argument regarding

24   individualized facts justifying continued detention such as danger or flight risk. <u>See</u> <u>Arpacio</u>, 2025

25   WL 2998098, at *1. Accordingly, there are cases where bond was granted to an individual, but the

26   individual continued to be detained based upon DHS's invocation of the automatic stay described

27

28   also is tasked to issue "precedent decisions" to "provide clear and uniform guidance to DHS, the
     immigration judges, and the general public on the proper interpretation and administration of the
     [INA] and its implementing regulations." <u>Id.</u>, § 1003.1(d)(1).

above.

### B. Individual Petitioners

The Court makes the following findings of fact relevant to each individual Petitioner.

#### 1. Petitioners Escobar-Salgado

Petitioner Gildardo Rogelio Escobar-Salgado is a citizen of Mexico who has resided in Utah for more than 20 years. Mr. Escobar-Salgado met his partner, Tammy Louise Staples, who is a U.S. citizen, in 2006, while they were both working the same shift at a Denny's in Salt Lake City. See ECF No. 8-1 at 3-5. He has been employed at Denny's since 1999. Id. He has not left the country since 2003, when he visited Mexico to see his mother who was dying of cancer. Id. Mr. Escobar-Salgado and Ms. Staples share three children who were born in the U.S.: an 8-year-old daughter, a 10-year-old son, and an 11-year-old son. Id. Mr. Escobar-Salgado is also a father to Ms. Staples's eldest daughter, who was only 2 years old when they met, and is now 17. Id. He has no criminal convictions. Id.

Mr. Escobar-Salgado is a devoted partner and father, and his family depends upon him for financial and emotional support. Id. His detention has been "shattering" for his family. Id. Ms. Staples is struggling to provide for their children with her income alone. Id. Due to Mr. Escobar-Salgado's detention, his family has had to leave their home of 8 years and give up their vehicle. Id. Without his support, Ms. Staples is struggling to fulfill her responsibilities at work and care for their children. Id. The children are devastated by his absence—their youngest daughter cries through the nights and their sons have emotionally shut down. Id. Denny's is holding Mr. Escobar-Salgado's position, awaiting his release from detention, because he is such a valued employee. Id.

On August 4, 2025, U.S. ICE Enforcement and Removal Operations (ERO) Fugitive Operations agents were actively engaged in surveillance at a residence in Salt Lake City and conducted a vehicle stop of Mr. Escobar-Salgado as he was leaving his home. See ECF No. 8-1 at 18. The ICE agents did not have, and Respondents have not produced, any warrant for his arrest. Id. They purportedly arrested him because he was "not in possession of valid immigration documents allowing him to be or remain in the United States legally." Id. ICE charged him as inadmissible as "an alien present in the United States without being admitted or paroled" pursuant

to § 1182(a)(6)(A)(i), commenced standard removal proceedings under § 1229a, and transferred him to the Salt Lake City Field office for processing. Id. He was then detained without bond at the Nevada Southern Detention Center (NSDC). Id.

Mr. Escobar-Salgado requested a custody redetermination by an IJ, and a bond hearing was held at the Las Vegas Immigration Court before IJ Baker on August 28, 2025. ECF No. 8-1 at 29. IJ Baker found Petitioner Escobar-Salgado was detained under § 1226(a), rejecting the new statutory interpretation of § 1225(b)(2) argued by DHS, because he was not designated as an "arriving alien." Id. IJ Baker further found Petitioner Escobar-Salgado was neither dangerous nor a flight risk, and appeared eligible for Cancellation of Removal, and granted bond in the amount of $2,000. Id.

On August 29, 2025, DHS filed an EOIR-43 form which automatically stayed the bond decision pursuant to 8 C.F.R. § 1003.19(i)(2). Id. at 32. DHS then filed its notice of appeal on September 5, 2025, through a representative. Id. ECF No. 8-1 at 34-58. The sole basis for the appeal is the government's new interpretation of § 1225(b)(2). Id. It does not appear from the record that DHS adequately preserved the automatic stay by filing the required certification of a high-level DHS legal official with the notice of appeal. See id.

On September 9, 2025, IJ Baker issued a memorandum decision regarding his grant of bond, as required by the appeal process. ECF No. 8-1 at 60-61. In the memorandum he stated that his authority to grant bond had been superseded by Hurtado. Id.

### 2.    Petitioner Mena-Vargas

Petitioner Juan Jose Mena-Vargas is a citizen of Mexico who first entered the U.S. without inspection in or around 1997. ECF No. 8-1 at 64-66. He has resided continuously in Utah since then. Id. He has two U.S. citizen children, and lives with his parents who are lawful permanent residents. Id. He is employed as a factory worker in West Jordan, Utah. Id. He has lived with HIV for over 25 years, which is managed by consistent, anti-viral medication. Id. He has been struggling with his health and energy levels and requires medication for depression and high cholesterol as well. Id. at 78-79. He has no criminal record. Id.

On September 10, 2025, ICE ERO Officers conducted a vehicle stop of Mr. Mena-Vargas

1    and took him into custody. Id. at 79. The ICE officers did not have a warrant. Id. They charged

2    him as "an alien present in the United States without being admitted or paroled" pursuant to 8

3    U.S.C § 1182(a)(6)(A)(i), commenced standard removal proceedings, and transported him to the

4    Salt Lake City Office for processing, and then transported him to Uinta County Jail. Id. He is

5    currently detained at NSDC without the ability to have a bond hearing pursuant to Hurtado. Id.

6                      **3.    Petitioner Reyes-López**

7           Petitioner Alejandro Reyes-López is married to a U.S. citizen, Leslie Justo, with whom he

8    has a 4-year-old daughter who is also a U.S. citizen by birth. ECF No. 8-1 at 83-84. Mr. Reyes-

9    López entered the country without inspection in or around April 2022, and has resided

10   continuously in Salt Lake City, Utah with his wife and child since. Id. His wife is currently in the

11   second trimester of a high-risk pregnancy. Id.

12          In or around April 2025, Mr. Reyes-López received a citation for alleged drag racing. Id.

13   That charge is pending. Id. He has no criminal convictions. Id. On or around September 5, 2025,

14   Mr. Reyes-López was purportedly arrested by ICE officials outside of his home due to the pending

15   citation; however, Respondents have not provided any details or records regarding the

16   circumstances of his arrest, detention, or immigration proceedings. See ECF No. 15 at 8. Petitioner

17   has been detained without the opportunity for a bond hearing at NSDC since September 5, 2025.

18

19   **III.    PROCEDURAL HISTORY**

20          On October 1, 2025, Petitioners commenced this action by filing a Petition for Writ of

21   Habeas Corpus under 28 U.S.C. § 2241. ECF No. 1. On October 2, 2025, the case was transferred

22   to the undersigned Judge. ECF No. 7. On October 3, 2025, Petitioners filed an Amended Petition.

23   ECF No. 8. The Court ordered service of the Amended Petition and set a briefing schedule. ECF

24   No. 9.

25          On October 10, 2025, Respondents filed their response to the Amended Petition. ECF No.

26   15. On October 17, 2025, the Court held a status conference in this and other related actions, based

27   on the Court's determination that Petitioners may be members of putative class actions challenging

28   the government's new mandatory detention policy. ECF No. 19. On October 21, 2025, Petitioners

1    filed their reply. ECF No. 20. On October 30, 2025, the Court held a hearing on the Amended

2    Petition and took the matter under advisement. See ECF No. 24. The Court's Order follows.

3

4    **IV.    LEGAL STANDARD**

5         The Constitution guarantees that the writ of habeas corpus is "available to every individual

6    detained within the United States." Hamdi v. Rumsfeld, 542 U.S. 507, 525 (2004) (citing U.S.

7    Const., Art I, § 9, cl. 2). "Its province, shaped to guarantee the most fundamental of all rights, is

8    to provide an effective and speedy instrument by which judicial inquiry may be had into the legality

9    of the detention of a person." Carafas v. LaVallee, 391 U.S. 234, 238 (1968). "The essence of

10   habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the

11   traditional function of the writ is to secure release from illegal custody." Preiser v. Rodriguez, 411

12   U.S. 475, 484 (1973).

13        A writ of habeas corpus may be granted to a petitioner who demonstrates that he is in

14   custody in violation of the Constitution or federal law. 28 U.S.C. § 2241(c)(3). Historically, "the

15   writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and

16   it is in that context that its protections have been strongest." I.N.S. v. St. Cyr, 533 U.S. 289, 301

17   (2001). Accordingly, a district court's habeas jurisdiction includes challenges to immigration-

18   related detention. Zadvydas v. Davis, 533 U.S. 678, 687 (2001); see also Demore v. Kim, 538 U.S.

19   510, 517 (2003). "The application for the writ usurps the attention and displaces the calendar of

20   the judge or justice who entertains it and receives prompt action from him within the four corners

21   of the application." Yong v. I.N.S., 208 F.3d 1116, 1120 (9th Cir. 2000) (citing 28 U.S.C. § 2243).

22

23   **V.    DISCUSSION**

24        **A. Jurisdiction**

25        As an initial matter, the Court has habeas jurisdiction to review Petitioners' challenge to

26   the lawfulness of their detention, because the relevant jurisdiction stripping provisions of the INA,

27   8 U.S.C. § 1252, do not apply.

28        Respondents assert that subsections (g), (b)(9), and (a)(5) preclude this Court's review. The

- 13 -

Court addresses each subsection in turn. In evaluating the jurisdiction stripping provisions of the INA, the Court is guided "by the general rule to resolve any ambiguities in a jurisdiction-stripping statue in favor of the narrower interpretation and by the strong presumption in favor of judicial review." Arce v. United States, 899 F. F.3d 796, 801 (9th Cir. 2018) (per curiam) (internal quotations and citations omitted).

### 1. Section 1252(g)

As to federal court proceedings, 8 U.S.C. § 1252(g) strips all courts of jurisdiction to hear "any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g). However, as interpreted by the Supreme Court, this Section applies "only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 482 (1999) (emphasis in original). Thus, § 1252(g) does not apply to "all claims arising from deportation proceedings." Id. Instead, "[t]he Supreme Court has given a 'narrow reading' to § 1252(g)." Ibarra-Perez v. United States, _ F.4th _, 2025 WL 2461663, at *6 (9th Cir. Aug. 27, 2025).

As the Ninth Circuit recently affirmed, federal courts have "jurisdiction to decide a 'purely legal question' that 'does not challenge the Attorney' General's discretionary authority' . . . even if the answer to that legal question . . . forms the backdrop against which the Attorney General later will exercise discretionary authority." Id. (quoting United States v. Hovsepian, 359 F.3d 1144, 1155 (9th Cir. 2004)).

Because Petitioners do not challenge ICE's decision to "commence" removal proceedings against them, nor the continued "adjudication" by the Attorney General of their removability in immigration court, but rather their detention without the opportunity for release on bond pending the resolution of those proceedings, § 1252(g) does not apply to this case. Id. at *6-7. Respondents' broad reading of § 1252(g) as insulating the lawfulness of Petitioners' detention from judicial review, based on the assertion that their detention "arises from the decision to commence [removal] proceedings against [them]," see Rodriguez Cabrera v. Mattos, Case No. 2:25-cv-01551-RFB-EJY

1    (D. Nev.), ECF No. 23 at 11,[10] "would lead to a result that is not contemplated in the statute and

2    that has been disavowed by the Supreme Court." Ibarra-Perez, 2025 WL 2461663, at *7.

3           Moreover, in cases where a noncitizen challenges the Attorney General's arguably

4    discretionary decision on a purely legal basis as a "violation [of] the Constitution" or "INA," courts

5    have jurisdiction to review such decisions as "premised on a lack of legal authority." Id. at *8. In

6    any case, because Petitioners challenge the lawfulness of their detention during the pendency of

7    their removal proceedings, they do not challenge one of the "three discrete events along the road

8    to deportation" that § 1252(g) applies to. Reno, 525 U.S. at 482. Section 1252(g) thus does not

9    deprive this Court of jurisdiction.

10                          **2.      Section 1252(b)(9)**

11          Similarly, Respondents' argument that the Court lacks jurisdiction to hear Petitioners'

12   challenge to the lawfulness of their detention without the opportunity for release on bond under §

13   1252(b)(9) has been expressly rejected by the Supreme Court. See Jennings, 583 U.S. at 291-92.

14   Section 1252(b)(9) limits judicial review of any legal challenges "arising from any action taken or

15   proceeding brought to remove an alien from the United States under this subchapter [including §§

16   1225 and 1226]" to judicial review of a final order of removal. 8 U.S.C. § 1252(b)(9).

17          In Jennings, the Supreme Court specifically rejected the government's broad reading of

18   "arising from" under § 1252(b)(9)—which Respondents reassert here—as "extreme," because by

19   only allowing challenges to detention authority through an appeal of a final order of removal (*i.e.*

20   after the period of detention under § 1225(b)(2) or §§ 1226(a) and (c) has ended)," that reading

21   would "make claims of prolonged detention effectively unreviewable." Id. at 293 ("By the time a

22   final order of removal was eventually entered, the allegedly excessive detention would have

23   already taken place. And of course, it is possible that no such order would ever be entered in a

24   particular case, depriving that detainee of any meaningful chance for judicial review.") Section

25   1252(b)(9) thus does not deprive this Court of jurisdiction.

26

27   _____

28          [10] Respondents incorporate this argument by reference, made in their Response to the
     Petition for Writ of Habeas Corpus in Rodriguez Cabrera. See ECF No. 15 at 22.

### 3.    Section 1252(a)(5)

Likewise, it is well settled that § 1252(a)(5) only strips a district court of habeas jurisdiction where a petitioner seeks judicial review of a final order of removal. See Singh v. Gonzales, 499 F.3d 969, 977-78 (9th Cir. 2007) (citing Puri v. Gonzales, 464 F.3d 1038, 1041 (9th Cir. 2006)) (holding that "the REAL ID Act's jurisdiction-stripping provisions . . . does [sic] not apply [if the] claim is not a direct challenge to an order of removal") (emphasis added). Because there is no final order of removal issued as to Petitioners, and Petitioners do not challenge any order of removal, § 1252(a)(5) does not strip this Court of jurisdiction over their challenge to the lawfulness of their detention while their removability is adjudicated.

### B.  The Automatic Stay

Before turning to Petitioners' challenges to the lawfulness of their detention under the INA and Due Process Clause, the Court first addresses Petitioner Escobar-Salgado's detention pursuant to the automatic stay under 8 C.F.R. § 1003.19(i)(2). This Court has already found the automatic stay is unconstitutional because it violates the procedural and substantive due process rights of noncitizen detainees like Petitioner Escobar-Salgado. See Herrera v. Knight, _ F. Supp. 3d. _, No. 2:25-CV-01366-RFB-DJA, 2025 WL 2581792 (D. Nev. Sept. 5, 2025). Thus, to the extent Respondents continue to detain Petitioner Escobar-Salgado pursuant to DHS's authority to stay IJ Baker's bond release order under 8 C.F.R. § 1003.19(i)(2), the Court finds his detention on that basis is unconstitutional for the same reasons discussed in Herrera.[11]

Respondents assert, however, that Petitioner's challenge to the automatic stay is moot, because IJ Baker recognized that his order was superseded by the BIA's decision in Hurtado. The Court finds, however, based on the record before it that it is not clear that IJ Baker rescinded his bond order, or if DHS's appeal of that order before the BIA is still pending. To the extent that the automatic stay is still in effect, the Court finds as indicated that Petitioner Escobar-Salgado's detention on that basis is unlawful.

Regardless of the status of the automatic stay as to Petitioner Escobar-Salgado, however,

---

[11] Additionally, the Court notes the notice of appeal of IJ Baker's bond release order failed to include the required certification under 8 C.F.R. § 1003.6(c), which means the stay of IJ Baker's bond release order has lapsed.

1    Respondents make clear they continue to detain Petitioner Escobar-Salgado based on their reading

2    of § 1225(b)(2), and the Petition challenges his detention on that statutory basis. The Court thus

3    turns to the statutory basis of all three Petitioners' detention.

4              **C. The Lawfulness of Petitioners' Detention Under the INA**

5              Petitioners challenge the lawfulness of their detention under the INA. Respondents assert

6    that § 1225(b)(2) applies to Petitioners and mandates their detention without a bond hearing.

7    Petitioners argue Respondents' interpretation of the statutory scheme of §§ 1225 and 1226 is

8    flawed. Petitioners further argue that they are entitled to a bond hearing under § 1226(a). This

9    Court agrees with Petitioners.

10             The Court rejects Respondents' construction of the relevant sections of the INA because

11   their argument runs afoul of well-settled judicial canons of statutory construction. In sum, the

12   Respondent's argument is based upon an expansive definition of "applicant for admission" under

13   § 1225 of the INA. Based upon this broad construction of the statutory definition of applicant for

14   admission, Respondents then assert that any noncitizens, like Petitioners, who have entered and

15   remained in the country unlawfully necessarily fall within this definition of applicant for

16   admission. As applicants for admission, Petitioners, according to Respondents' argument, are thus

17   subject to the mandatory detention provision in § 1225(b)(2) and not the bond procedures afforded

18   under § 1226. As explicated below, Respondents' proffered interpretation is unconvincing and

19   inconsistent with multiple fundamental canons of statutory construction, as well as legislative

20   history and decades of agency practice. The Court finds that the proper construction of §§ 1225

21   and 1226 demonstrates that Petitioners are in fact entitled to a bond hearing under § 1226(a) and

22   its implementing regulations.

23             **i. *Relevant Canons of Statutory Construction***

24             The first step of statutory interpretation is interpreting the plain meaning of the statute's

25   text. Esquivel-Quintana v. Sessions, 581 U.S. 385, 391 (2018) ("We begin, as always, with the

26   text."). The task is to interpret the text according to its "ordinary, contemporary, common

27   meaning." Sandifer v. United States Steel Corp., 571 U.S. 220, 227 (2014) (quotation omitted).

28   "Where the language is plain and admits of no more than one meaning, the duty of interpretation

does not arise, and the rules which are to aid doubtful meanings need no discussion." <u>Caminetti v. U.S.</u>, 242 U.S. 470, 485 (1917). However, the INA is a "dense statute" with "complex provisions" and "[d]ivining its meaning is ordinarily not for the faint of heart." <u>Torres v. Barr</u>, 976 F.3d 918, 923 (9th Cir. 2020). As such, the court must "use every tool at [its] disposal to determine the best reading of the statute." <u>Loper Bright Enters. v. Raimando</u>, 603 U.S. 369, 400 (2024). Accordingly, canons of statutory construction aid in the interpretation of the statutory text.

As relevant here, "[i]n ascertaining the plain meaning of the statue, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." <u>K Mart Corp. v. Cartier, Inc.</u>, 488 U.S. 281, 291 (1988). It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." <u>Davis v. Michigan Dept. of Treasury</u>, 489 U.S. 803, 809 (1989). The words in the specific provisions and subdivisions are to be read in accordance with common sense. <u>See</u> <u>Kyong Ho Shin v. Holder</u>, 607 F.3d 1213, 1220 (9th Cir. 2010) (counseling that courts must use common sense in construing the INA), and in context; <u>see also</u> <u>Abramski v. United States</u>, 573 U.S. 169, 179 (2014) (explaining that courts "interpret the relevant words not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose'") (quoting <u>Maracich v. Spears</u>, 570 U.S. 48, 76 (2013)).

Further, when interpreting specific provisions, "the canon of *noscitur a sociis* teaches that" a broadly defined word or phrase "is 'given more precise content by the neighboring words with which it is associated.'" <u>Pulsifer v. U.S.</u>, 601 U.S. 124, 149 (2024) (quoting <u>United States v. Williams</u>, 553 U.S. 285, 294 (2008)). Likewise, "[i]n a given statute, the same term usually has the same meaning and different terms usually have different meanings." <u>Id.</u> (citing A. Scalia & B. Garner, Reading Law 170–171 (2012)). Similarly, the canon against surplusage applies to give effect "to every clause and word of a statute," such that where an interpretation renders language superfluous, a competing interpretation that avoids superfluity or excess language controls. <u>See</u> <u>Microsoft Corp. v. I4I Ltd. Partn.</u>, 564 U.S. 91, 106 (2011) Moreover, when a statutory construction renders an entire provision or subparagraph meaningless, "the canon against surplusage applies with special force." <u>Pulsifer</u>, 601 U.S. at 149 (citing <u>2024 National Assn. of</u>

1    Mfrs. v. Department of Defense, 583 U.S. 109, 128 (2018)). And courts are duty-bound to read

2    the INA "as a symmetrical and coherent regulatory scheme," Gustafson v. Alloyd Co., 513 U.S.

3    561, 569 (1995), and "fit, if possible, all parts into an harmonious whole," FTC v. Mandel Brothers,

4    Inc., 359 U.S. 385, 389 (1959). "Our rules aiming for harmony over conflict in statutory

5    interpretation grow from an appreciation that it's the job of Congress by legislation, not this Court

6    by supposition, both to write the laws and to repeal them." Epic Sys. Corp. v. Lewis, 584 U.S. 497,

7    511 (2018)

8           Legislative history, congressional intent, and historical context is relevant to confirm

9    textual analysis. See Biden v. Texas, 597 U.S. 785, 804 (2022) (interpreting a subparagraph of §

10   1225(b)(2) and finding "[t]he historical context in which the provision was adopted confirms the

11   plain import of its text") (citing Niz-Chavez v. Garland, 593 U. S. 155, 165 (2021) (textual analysis

12   confirmed by "a wider look at [the statute's] structure and history")). However, "legislative history

13   is not the law." Epic Sys. Corp, 584 U.S. at 523 (2018) ("It is the business of Congress to sum up

14   its own debates in its legislation, and once it enacts a statute we do not inquire what the legislature

15   meant; we ask only what the statute means.") (quoting Schwegmann Brothers v. Calvert Distillers

16   Corp., 341 U.S. 384, 396, 397 (1951) (Jackson, J., concurring) (quoting Justice Holmes)).

17          Additionally, and perhaps most critically with regards to Respondents' claim that the

18   government has vast authority to detain millions of noncitizens in the U.S. without a bond hearing,

19   courts must "read this dense statute against the backdrop of our constitutional principles." Torres,

20   976 F.3d at 922 (citing Zadvydas v. Davis, 533 U.S. 678, 690–993 (2001)). "A statute permitting

21   indefinite detention of an alien would raise a serious constitutional problem." Zadvydas, 533 U.S.

22   at 690. And "it is a cardinal principle of statutory interpretation . . . that when an Act of Congress

23   raises 'a serious doubt' as to its constitutionality," courts will "first ascertain whether a

24   construction of the statute is fairly possible by which the question may be avoided." Id. at 689

25   (internal quotations and citations omitted).

26          Finally, regardless of the BIA's recent decision in Hurtado, the task of resolving this

27   statutory question belongs to the independent judgment of the courts without deference to agency

28   interpretation. Loper Bright Enters, 603 U.S. at 403 ("the Framers crafted the Constitution to

1    ensure that federal judges could exercise judgment free from the influence of the political

2    branches."); id. at 403-04 ("Courts interpret statutes, no matter the context, based on the traditional

3    tools of statutory construction, not individual policy preferences"); id. at 412-13 ("Courts must

4    exercise their independent judgment in deciding whether an agency has acted within its statutory

5    authority").

6                    **ii.   *Interpreting Sections 1225(b)(2) and 1226(a) of the INA***

7            The Court now turns to the construction of the two sections at issue in the INA: §§ 1225

8    and 1226.

9            The Court starts with § 1225 and the statutory meaning asserted by Respondents. Section

10   1225(a)(1) defines "aliens treated as applicants for admission" under this Section as follows:

11                 An alien present in the United States who has not been admitted or
12                 who arrives in the United States (whether or not at a designated port
                   of arrival and including an alien who is brought to the United States
13                 after having been interdicted in international or United States
                   waters) shall be deemed for purposes of this chapter an applicant for
14                 admission.

15   The plain text of § 1225(a)(1), at first blush, would appear to encompass noncitizens, like

16   Petitioners, charged with being "present in the United States without being admitted" under §

17   1182(a)(6)(A) and thus categorize them as "applicants for admission." The government's new

18   statutory interpretation relies heavily upon this broad construction of the plain language of the

19   statute as to the definition of an "applicant for admission." Based upon this broad reading, the

20   Respondents assert that any noncitizen who falls under the definition of "an applicant for

21   admission" is subject to the detention and removal proceedings set forth in § 1225(b). Section

22   1225(b)(2)(A) provides:

23                 In general. Subject to subparagraphs (B) and (C), in the case of an
24                 alien who is an applicant for admission, if the examining
                   immigration officer determines that an alien seeking admission is
25                 not clearly and beyond a doubt entitled to be admitted, the alien ***shall
                   be detained*** for a proceeding under section 240 [8 USCS § 1229a].
26

27   Id. (emphasis added). Thus, a straightforward and simplistic review of the plain text of § 1225 by

28   itself would seem to indicate that any noncitizen unlawfully in the country is subject to detention

1   until removal proceedings conclude. Id. However, § 1225 is not the only statute implicated in the

2   apprehension and detention of noncitizens. In construing § 1225, we must also look at § 1226, as

3   statutory construction requires looking at the "overall statutory scheme." Davis, 489 U.S. at 809

4   (1989).

5       Section 1226 is entitled "[a]pprehension and detention of aliens." Section 1226(a) states

6   that "on a warrant issued by the Attorney General, an alien may be arrested and detained pending

7   a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). It

8   goes on to provide, "[e]xcept as provided in subsection (c) and pending such decision," when a

9   noncitizen is arrested under this Section, the Attorney General "may" detain them or release them

10  on bond "of at least $1,500" or "conditional parole." Id. at §§ 1226(a)(1)-(2). This discretionary

11  decision of the Attorney General is implemented through a bond hearing before an immigration

12  judge, where evidence is considered regarding whether detention or release on bond is warranted,

13  including evidence of a noncitizen's ties to the U.S., their criminal history, and other factors

14  relevant to whether they are a flight risk or a danger to the community. 8 C.F.R. § 1236.1(d); see

15  also Martinez v. Clark, 124 F.4th 775, 783 (9th Cir. 2024).

16      Section 1226(c) then "carves out a statutory category of aliens who may *not* be released

17  under § 1226(a)." Jennings, 583 U.S. at 289 (emphasis in original). This subsection mandates

18  detention for a noncitizen "who falls into one of several enumerated categories involving criminal

19  offenses and terrorist activities." Id. Importantly, the text of § 1226(c) requires detention for certain

20  noncitizens charged as "deportable" (meaning they were previously lawfully admitted to the

21  United States) or "inadmissible" under, *inter alia*, 8 U.S.C. §§ 1182(a)(6)(A), (6)(C), or (7)

22  (meaning they have not been admitted to the United States).[12] See 8 U.S.C. §§ 1226(c)(1)(A)–(E).

23  Relevant here, § 1226(c) requires detention for a noncitizen who is deemed inadmissible because

24  he is "present in the United States without being admitted or paroled" under § 1182(a)(6)(A) ***and***

25  "is charged with, is arrested for, is convicted of, admits having committed, or admits committing

26  _____

27      [12] In general, grounds for "deportability," as set forth in 8 U.S.C. § 1227, apply to
    noncitizens who were previously lawfully admitted, such as lawful permanent residents, while
28  grounds for inadmissibility, set forth in 8 U.S.C. § 1182, apply to noncitizens who "have not
    previously been admitted" into the U.S. See Barton v. Barr, 590 U.S. 222, 234 (2020).

1   acts which constitute the essential elements" of certain crimes. 8 U.S.C. §§ 1226(c)(1)(E)(i)–(ii).

2       A plain reading of the exceptions under § 1226(c), and the fact that such "exceptions" to

3   the availability of being released on bond exist, supports a finding that § 1226(a) applies to all

4   noncitizens who like Petitioners, are charged as being "present in the United States without being

5   admitted or paroled" under § 1182(a)(6)(A) but who have ***not*** been implicated in any of the

6   enumerated crimes set forth in § 1226(c). See Shady Grove Orthopedic Assocs. P.A. v. Allstate

7   Ins. Co., 559 U.S. 393, 400 (2010) (finding that where Congress creates "specific exceptions" to a

8   statutes general applicability, it "proves" that absent those exceptions, the statute generally

9   applies). There would be no need for Congress to create exceptions for individuals like Petitioners

10  if they were subject to mandatory detention without review under § 1225(b)(2). Id.

11      Respondents' reading of the INA directly conflicts with the above plain reading of §

12  1226(a) as applying by default to all noncitizens charged with being present without being

13  admitted or paroled, because it asserts that any noncitizen who falls under the definition of "an

14  applicant for admission," under § 1225(a)(1) is subject to the detention and removal proceedings

15  set forth in § 1225(b). Respondents seek to resolve the apparent conflict of their reading of § 1225

16  with a plain reading of § 1226 by asserting the former should prevail over the latter. As explained

17  by the BIA in Hurtado, the government's new reading asserts that because § 1226 "does not purport

18  to overrule the mandatory detention requirements for arriving aliens and applicants for admission

19  explicitly set forth" in § 1225(b), any noncitizen who entered the country without inspection "shall

20  be detained" under § 1225(b)(2) during the pendency of removal proceedings. Hurtado, 29 I&N at

21  218-19 (quoting § 1225(b)(2)).

22      The Court finds Respondents' reading (and the BIA's reading in Hurtado) to be

23  unpersuasive and misplaced. Respondents' reading of the INA fails to adequately consider the

24  entirety of the text of § 1225, and paragraph (b)(2) in particular, in contravention of fundamental

25  canons of statutory construction. As discussed in detail below, when read in context, and

26  harmoniously with § 1226, the Court finds the plain meaning conveyed by the text of § 1225(b) is

27  that it applies within a specific context: at or near the border, to noncitizens "arriving" in the U.S—

28  not those already present within its borders.

1          First, the title of § 1225 indicates that it concerns "inspection by immigration officers," and

2   "expedited removal of inadmissible arriving aliens." 8 U.S.C. § 1225. Moreover, paragraph (a)(1)

3   explains its definition of "aliens treated as applicants for admission" is for purposes of

4   "inspection." Id., § 1225(a)(1). Section 1225(b) concerns "[i]nspection of applicants for

5   admission." Paragraph (b)(1) goes on to set forth the procedure for inspection and expedited

6   removal of "aliens *arriving* in the United States and certain other aliens who have not been

7   admitted or paroled." Id., § 1225(b)(1) (emphasis added). Paragraph (b)(1) then states  it applies

8   to "an alien . . . who is arriving in the United States," and other "certain other aliens" designated

9   by the Attorney General "who [have] not been admitted or paroled into the United States" and

10  "who [have] not affirmatively shown . . . that [they have] been physically present in the United

11  States continuously for the 2-year period immediately prior to the determination of

12  inadmissibility." Id.

13         Section 1225(b)(2), the provision at issue here, concerns "[i]nspection of other aliens" not

14  covered by Paragraph (b)(1). Paragraph (b)(2)(A) states:

15                      [I]n the case of an alien who is an applicant for admission, if the
                        examining immigration officer determines that an alien seeking
16                      admission is not clearly and beyond a doubt entitled to be admitted,
                        the alien shall be detained for a proceeding under section 1229a of
17                      this title.

18  Id., § 1225(b)(2)(A). By its plain text, § 1225(b)(2) thus applies where several conditions are met:

19  (1) an "examining immigration officer" in the context of "inspection" (2) determines that an

20  individual is an "applicant for admission" who is (3) "seeking admission." By its plain text, §

21  1225(b)(2)(A) narrows the above broader definition of "applicants for admission" under §

22  1225(a)(1) and states that it applies in the context of (1) "inspection" by an "examining

23  immigration officer" to (2) "applicants for admission" as defined above, who are (3) "seeking

24  admission," and (4) to whom § 1225(b)(1) does not address.

25         Again, Respondents assert that "applicant for admission" is the key phrase, and that the

26  utilization of that phrase in § 1225(b)(2) necessarily stretches it to encompass any noncitizen in

27  the U.S. who has not been admitted, even where they are already present in the country, having

28  entered without inspection some time ago. This expansive reading of the term has been rejected

by the Ninth Circuit. As the Ninth Circuit held in interpreting the phrase "applicant for admission" within the context of the application of § 1225(b)(1) to a noncitizen who was placed in expedited removal proceedings thirteen years after entry, "an immigrant submits an 'application for admission' at a distinct point in time" and "stretching the phrase" to continue "potentially for years or decades" "would push the statutory text beyond its breaking point." U.S. v. Gambino-Ruiz, 91 F.4th 981, 988-89 (9th Cir. 2024) (citing Torres, 976 F.3d at 922-26). The Court is thus unpersuaded that Petitioners and other similarly situated noncitizens who have resided in the U.S. for years are properly characterized as perpetual "applicant[s] for admission" for purposes of "inspection" under § 1225, when they are not in fact intercepted in the context of inspection by immigration officers at or near ports of entry.

Section 1225(b)'s limited spatial and temporal application to noncitizens intercepted at or near a port of entry is further evident in other provisions of § 1225 that suggest Congress's focus was on inspection of noncitizens at ports of entry or of recent arrivals, not longtime residents intercepted far from any border. See K Mart Corp., 488 U.S. at 291 ("In ascertaining the plain meaning of the statue, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.") (citations omitted); see also Biden v. Texas, 597 U.S. at 799-800 (evaluating statutory structure to inform interpretation of the INA). For example, § 1225's title refers to the "inspection" of "inadmissible arriving" noncitizens, while its subsections set forth procedures for "examining immigration officer[s]" §§ 1225(b)(2)(A), (b)(4), to engage in "[i]nspection[s]" of individuals "arriving in the United States," §§ 1225(a)(3), (b)(1), (b)(2), (d). The plain meaning of the terms inspection and examination is not spatially and temporally unlimited—rather it describes a specific legal process one undergoes when trying to enter the country at a border or port of entry. Thus, the notion that an ICE officer conducting removal operations within the continental United States, far from any port of entry, is engaging in "Inspection of Applicants for Admission" as contemplated in § 1225(b) contradicts the plain meaning of the text when placed in context of the overall Section and its headings.

Further, § 1225(a)(3), entitled "Inspection," provides that "[a]ll aliens (including alien crewman) who are applicants for admission or otherwise seeking admission or readmission to or

1    transit through the United States shall be inspected by immigration officers." 8 U.S.C. §

2    1225(a)(3). This suggests that the type of inspection by an examining immigration officer referred

3    to in §1225(b)(2)(A) is an inspection by an examining immigration officer that occurs at the time

4    an alien first applies for or otherwise seeks admission to the United States—not an encounter with

5    an ICE officer conducting removal operations far from any port of entry, long after the noncitizen

6    encountered by ICE first entered the country. As such, the Court finds the structure of § 1225(b)(2)

7    further indicates that it authorizes mandatory detention for noncitizens entering, attempting to

8    enter, or who have recently entered the U.S., and does not encompass individuals like Petitioners,

9    who entered without admission long ago.

10       Moreover, Respondents' reading of "applicants for admission" ignores the fact that that

11   term is further limited in §1225(b)(2) by the active construction of the phrase "seeking admission"

12   which entails some type of affirmative action taken to obtain entry. See, e.g., Martinez v. Hyde,

13   No. CV 25-11613-BEM, 2025 WL 2084238 (D. Mass. July 24, 2025); see also Lopez Benitez v.

14   Francis, No. 25 CIV. 5937 (DEH), 2025 WL 2371588, at *7 (S.D.N.Y. Aug. 13, 2025). It is

15   inconsistent with the ordinary meaning of the phrase "seeking admission" to apply this section to

16   all noncitizens already present and residing in the U.S., regardless of whether they are taking any

17   affirmative acts that constitute "seeking admission." As the Lopez Benitez Court analogized,

18   "someone who enters a movie theater without purchasing a ticket and then proceeds to sit through

19   the first few minutes of a film would not ordinarily then be described as 'seeking admission' to

20   the theater." Id. at *7.

21       Therefore, the statutory text, when read in accordance with its ordinary meaning, and in

22   context, indicates that for purposes of mandatory detention under § 1225(b)(2)(A), the phrases

23   "applicants for admission" and "seeking admission," taken together, are limited in temporal and

24   geographic scope and apply within the specific context of the inspection of "arriving" noncitizens,

25   at or near ports of entry. See Saxon, 596 U.S. at 455 (to discern the ordinary meaning of statutory

26   language, "words must be read and interpreted in their context, not in isolation.") (quotations and

27   citations omitted). In other words, the phrase "seeking admission" in § 1225(b)(2)(A) narrows the

28   class of "applicants for admission" who are subject to mandatory detention, such that not all

"applicants for admission" already "present in the United States," as defined in § 1225(a)(1), are subject to inspection and mandatory detention as prescribed in paragraph (b)(2). See Lopez Benitez, 2025 WL 2371588, at *6 ("If, as Respondents argue, § 1225(b)(2)(A) were intended to apply to all 'applicant[s] for admission,' there would be no need to include the phrase 'seeking admission' in the statute.").

Indeed, the reading asserted by Respondents and the BIA in Hurtado depends on discounting the phrase "seeking admission" as a mere redundancy of the phrase "applicants for admission." See ECF No. 15 at 13 (quoting Hurtado, 29 I.&N. at 221). Respondents assert the phrases "applicants for admission" and "seeking admission" are "synonymous," based on a phrase in a different paragraph of the Section, § 1225(a)(3), which requires "inspection" of all noncitizens "who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States." See ECF No. 15 at 14 (quoting 8 U.S.C. § 1225(a)(3)). Respondents cite to the Supreme Court's decision in U.S. v. Woods, 571 U.S. 31 (2013), to argue that the word "or" in that phrase introduces an appositive which is "a word or phrase that is synonymous with what precedes it ('Vienna or Wien,' 'Batman or the Caped Crusader')" and shows that Congress intended "applicants for admission" and noncitizens "seeking admission" to mean the same thing. Id. (quoting Woods, 571 U.S. at 45). But as identified by another district court in rejecting the same argument and citation, "the case cited by the government to suggest that the word 'or' introduce[s] an appositive' actually says the opposite is generally true." Romero v. Hyde, _ F. Supp. 3d. _, No. CV 25-11631-BEM, 2025 WL 2403827, at *10 n.31 (D. Mass. Aug. 19, 2025) (citation omitted); see Woods, 571 U.S. at 45 ("Moreover, the operative terms are connected by the conjunction 'or.' While that can sometimes introduce an appositive—a word or phrase that is synonymous with what precedes it . . .—its ordinary use is almost always disjunctive, that is, the words it connects are to be given separate meanings.").

Moreover, the very BIA precedent Respondents and the BIA in Hurtado cite as supporting the interpretation of "applicants for admission" and "seeking admission" as synonymous, distinguishes between the two as delineating distinct categories of noncitizens, such that a noncitizen could be "seeking admission" without falling under the § 1225(a)(1) definition of

"applicant for admission" because they are neither "present in the United States" nor arriving in the United States. See Matter of Lemus-Losa, 25 I&N Dec. 734, 741 (BIA 2012) (describing the circumstances in which a noncitizen could "seek admission" without arriving or being present in the United States: "for example, by applying for a visa at a consulate abroad"). Likewise, the BIA in Lemus-Losa explicitly distinguished acts defining "an applicant for admission" from those "seeking admission." See id. at 735 (where a noncitizen who initially entered the U.S. without inspection, departed, then reentered, and applied for adjustment of status, finding that "in some cases such an alien will have reentered the United States unlawfully, thereby making himself an 'applicant for admission' by operation of law, while seeking 'admission' through adjustment of status.").

These distinctions recognize that the use of the two different phrases by Congress is not a redundancy, but rather, conveys a meaningful difference. Interpreting the two phrases accordingly comports with canons of statutory interpretation. See, e.g., Sw. Airlines Co., 596 U.S. at 457-58 (discussing and applying "the meaningful-variation canon") (citing A. Scalia & B. Garner, Reading Law 170 (2012) ("[W]here [a] document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea.")); see also United States, ex rel. Polansky v. Exec. Health Res., Inc., 599 U.S. 419, 432 (2023) ("[E]very clause and word of a statute should have meaning.") (citation omitted).

Further, noncitizens like Petitioners, who have already entered and are present in the country, are not "seeking admission" consistent with the ordinary meaning of that phrase. Rather, where they are not intercepted at the border or shortly after having crossed it, they have already "effected an entry" for purposes of immigration law. See Dept. of Homeland Sec. v. Thuraissigiam, 591 U.S. 103, 140 (2020) (finding "an alien who tries to enter the country illegally is treated as an 'applicant for admission,'" under § 1225(a)(1), and an alien who is detained shortly after unlawful entry cannot be said to have "effected an entry") (quoting Zadvydas v. Davis, 533 U.S. 678, 693 (2001)). This distinction is critical because "aliens who have established connections in this country" have greater due process rights than "an alien at the threshold of initial entry." Thuraissigiam, 591 U.S. at 107.

Just as Respondents' reading would render the phrase "seeking admission" in § 1225(b)(2) redundant, accepting Respondents' reading would also render the exceptions of § 1226 under Paragraph (c) that apply to certain categories of inadmissible noncitizens superfluous or meaningless. Shulman v. Kaplan, 58 F.4th 404, 410–11 (9th Cir. 2023) ("a court must interpret the statute as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.") (citation and quotation marks omitted). The fact that the Laken Riley Act amended § 1226(c) to add additional categories of noncitizens who are subject to mandatory detention further supports a plain reading of § 1226(a) as applying by default to noncitizens charged as inadmissible because they are present in the country without having been lawfully admitted. See Gieg v. Howarth, 224 F.3d 775, 776 (9th Cir. 2001) ("When Congress acts to amend a statute, [courts] presume it intends its amendments to have real and substantial effect."); see also Diaz Martinez, 2025 WL 2084238, at *7 ("if, as the Government argue[s], . . . a noncitizen's inadmissibility were alone already sufficient to mandate detention under section 1225(b)(2)(A), then the 2025 amendment would have no effect").

In Hurtado, the BIA asserts that the fact that portions of § 1226(c) would be rendered superfluous should not dissuade its broad reading of § 1225(b)(2)(A) because the references to inadmissibility in § 1226(c) can be dismissed as a redundancy by Congress. See Hurtado, 29 I&N at 222 (quoting Barton v. Barr, 59 U.S. 222, 239 (2020) ("redundancies are common in statutory drafting—sometimes in a congressional effort to be doubly sure, sometimes because of congressional inadvertence or lack of foresight, or sometimes simply because of the shortcomings of human communication")). The government thus insists § 1226(c) should be read out of the INA to the extent it is irreconcilable with its broad new reading of § 1225(b)(2). But the differences between § 1225 and § 1226 do not indicate the former should prevail over the latter—rather, they can be read in harmony, as applying to different classes of noncitizens. This harmonious reading *must* prevail over a reading that would create an unnecessary conflict or redundancy between the two provisions, because "the Court does not lightly assume Congress adopts two separate clauses in the same law to perform the same work," and there is no evidence that Congress did so in

enacting the exceptions under § 1226(c) as amended by the Laken Riley Act. <u>United States v. Taylor</u>, 596 U.S. 845, 847 (2022).

This Court's harmonious reading of §§ 1225 and 1226 of the INA is consistent with the Supreme Court's interpretation of these same sections. Specifically, the Supreme Court in <u>Jennings</u> interpreted §§ 1225 and 1226 in a manner that harmonizes them, rather than puts them in conflict with one another. In discussing § 1225, the Court described the procedures under that section as part of a process that "generally begins at the Nation's borders and ports of entry, where the Government must determine whether an alien seeking to enter the country is admissible." 583 U.S. at 287. In contrast, when discussing § 1226, the Supreme Court described it as governing "the process of arresting and detaining" noncitizens "who are already present inside the U.S." pending a decision on their removability because they were "inadmissible at the time of entry." <u>Id.</u> at 285, 288. The Court summarized the interplay between the two Sections as follows:

> In sum, U.S. immigration law authorizes the Government to detain certain aliens *seeking admission* into the country under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain aliens *already in the country* pending the outcome of removal proceedings under §§ 1226(a) and (c).

<u>Id.</u> at 289 (emphasis added). The Court finds this interpretation comports with the plain meaning of the statutory provisions, when read in accordance with canons of statutory construction— perhaps most importantly, the "harmonious-reading canon," which counsels that "there can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously." <u>See</u> A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 180 (2012) ("The imperative of harmony among provisions is more categorical than most other canons of construction because it is invariably true that intelligent drafters do not contradict themselves (in the absence of duress).").

In sum, the Court finds that the plain meaning of the relevant statutory provisions, when interpreted according to fundamental canons of statutory construction, clearly establishes that Respondents and the BIA's new statutory interpretation of § 1225(b)(2) runs far afoul of the statutory text and structure.

1.  <u>Legislative History</u>

The Court now turns to the legislative history of the INA as Respondents further argue that this history supports their reading of the INA. The Court first notes that while legislative history is an "additional tool of analysis," "only the most extraordinary showing of contrary intentions from those data would justify a limitation on the 'plain meaning' of the statutory language." <u>Garcia v. U.S.</u>, 469 U.S. 70, 75 (1984). With that in mind, the Court turns to the legislative history, and finds that as discussed below, Respondents and the BIA's account of legislative intent is *not* supported by the legislative record they refer to, and in fact, the legislative history further supports the above harmonious reading of §§ 1225 and 1226 and demonstrates the many flaws in the government's new interpretation of § 1225(b)(2).

The legislative history of the IIRIRA amendments further supports interpreting the INA as subjecting noncitizens like Petitioners, who are already present and residing in the U.S., to discretionary detention with its associated procedural protections under § 1226(a), rather than mandatory detention under § 1225(b).

In enacting IIRIRA, Congress specified that § 1226(a) simply restated the discretionary detention authority applicable to all noncitizens *present* in the U.S. pending deportability proceedings, formerly codified at 8 U.S.C. § 1252(a) (1) (1994). H.R. Rep. No. 104-469, pt. 1, at 229 (declaring § 1226(a) "restates the current provisions in [the predecessor statue] regarding the authority of the Attorney General to arrest, detain, and release on bond an alien who is not lawfully in the United States."); <u>see also</u> H.R. Rep. No. 104-828, at 210 (same). Respondents assert however that Congress intended § 1225(b)(2) to mandate the detention of all noncitizens "who have not been lawfully admitted" during removal proceedings, "regardless of their physical presence in the country" in an effort to replace "certain aspects of the current 'entry doctrine," "an anomaly whereby immigrants who were attempting to lawfully enter the United States were in a worse position than persons who had crossed the border unlawfully." <u>See</u> ECF No. 15 at 14-15 (citing <u>Torres</u>, 976 F.3d at 928 (citing <u>Yin Hing Sum v. Holder</u>, 602 F.3d 1092, 1100 (9th Cir. 2010)); H.R. Rep. No. 104-469, pt. 1, at 225–29 (1996).

However, a review of this legislative history as discussed by the Ninth Circuit in <u>Torres</u>,

and in the portions of the House Report cited by Respondents, reveals that Congress sought to address this "anomaly" in the context of *removal proceedings* under the INA—by consolidating the formerly bifurcated deportation and exclusion proceedings—with *no mention* of any intent to alter detention authority under the INA. See Torres, 976 F.3d at 928, ("Now, in removal proceedings, the relevant distinction for procedural purposes is whether the immigrant has been lawfully admitted, regardless of actual presence."); id. (comparing noncitizens burden of proof when considered an "applicant for admission" under 8 U.S.C. § 1229a(c)(2)(A) with the government's burden of proof when a noncitizen in removal proceedings has been lawfully admitted under § 1229a(c)(3)(A)); H.R. Rep. 104-469, pt. 1, at 225 (explaining that § 1225(a)(1) "[wa]s intended to replace certain aspects of the current 'entry doctrine,' under which illegal aliens who have entered the United States without inspection gain equities and privileges *in immigration proceedings* that are not available to aliens who present themselves for inspection at a port of entry") (emphasis added).

The IIRIRA amendments created a standard removal proceeding before an IJ to determine whether a noncitizen "has or has not been lawfully admitted to the U.S." H.R. Rep. No. 104-469, p. 1, at 157-58. This standard removal proceeding consolidated the former two types of removal proceedings for "exclusion" and "deportation." Id. Prior to IIRIRA, "[a] deportation hearing was the 'usual means of proceeding against an alien already physically [but not lawfully] in the United States,' while an exclusion hearing was the 'usual means of proceeding against an alien outside the United States seeking admission.'" Torres, 976 F.3d at 927 (quoting Hose v. I.N.S., 180 F.3d 992, 994 (9th Cir. 1999) (*en banc*) (alterations in original). In the context of removal proceedings, a noncitizen in a "deportation hearing" had greater procedural and substantive rights than a noncitizen who presented themselves at a port of entry for inspection who would be placed in an "exclusion hearing." See Landon v. Plasencia, 459 U.S. 21, 25-26 (1982) (explaining some of the differences between deportation and exclusion hearings).

In creating standard removal proceedings under § 1229a, nothing in the legislative history indicates Congress intended to alter the detention regime for noncitizens pending the outcome of those proceedings—to the contrary, Congress clarified the IIRIRA amendments did *not* alter the

ability of noncitizens who are present in the country illegally to secure release on bond under § 1226(a). See H.R. Rep. No. 104-469, pt. 1, at 229; see also H.R. Rep. No. 104-828, at 210. As one district court put it, "the BIA erred in its analysis [in Hurtado] by identifying one of Congress' concerns in enacting IIRIRA and then treating it as Congress' sole concern driving the statute." Salcedo Aceros v. Kaiser, No. 25-CV-06924-EMC (EMC), 2025 WL 2637503, at *11-12 (N.D. Cal. Sept. 12, 2025). The Court agrees that "Congress' concern about adjusting the law in some respects to reduce inequities in the removal process does not suggest Congress intended to entirely up-end the existing detention regime by subjecting *all* inadmissible noncitizens to mandatory detention, a seismic shift in the established policy and practice of allowing discretionary release under Section 1226(a)—the scope of which Congress did not alter." Id. at *12. Moreover, the regulations enacting the INA specifically maintain that detention and an IJ's consideration of requests for "custody or bond" are specifically designated as "separate and apart from, and shall form no part of, any deportation or removal hearing or proceeding." 8 C.F.R § 1003.19(d). The government's new account of Congress's intent as drastically expanding mandatory detention is simply not expressed in the legislative history that Respondents and the BIA rely on.

In fact, the legislative history reflects that Congressional intent was the opposite of what the government now contends: that mandatory detention under § 1225(b)(2) was contemplated and intended to apply to "arriving" not citizens, not those already present in the country. The IIRIRA amendment at § 1225(b)(2) is specifically referred to by Congress as involving the "[i]nspection of other *arriving aliens*." H.R. Rep. 104-469, pt. 1, at 229 (emphasis added). And the term "arriving alien" employed at several points throughout the IIRIRA amendments was intended to distinguish "aliens at the border of the United States from those who have made a substantial physical entry into the United States." See Implementation of Title III of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996: Hearing Before the Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary, 105th Cong. 17–18 (1997), at 99 (Statement by Representative Lamar Smith, Chairman of the House Judiciary Committee's Subcommittee on Immigration and Claims). And with regards to detention under § 1225(b)(2), it was explicitly noted that Congress was referring to "custody of aliens applying at land borders" in enacting that section. Id. at 101.

1       Importantly, in distinguishing between noncitizens "arriving" versus noncitizens residing

2  in the U.S., Congress reflected its understanding of longstanding due process precedent that

3  recognizes the more substantial due process rights of noncitizens already present and residing in

4  the U.S. compared to the minimal rights of noncitizens seeking to enter or recently arriving in the

5  country. See H.R. Rep. No. 104-469, p. 1 at 163-66 (recognizing the "constitutional liberty interest

6  to remain in the U.S." held by noncitizens "present in the U.S." versus the lack of a liberty interest

7  in entering the U.S. held by "aliens seeking admission," i.e., "initial entrants," i.e., "applicant[s]

8  for initial entry") (first quoting Landon v. Plasencia, 549 U.S. 21, 32 (1982), then quoting Knauff

9  v. Shaughnessy, 338 U.S 537 (1950)).

10       This distinction "between an alien who has effected an entry into the United States and one

11  who has never entered" which "runs throughout immigration law" recognizes arriving noncitizens

12  have less due process protections than those present and residing within the country's borders. See

13  Zadvydas, 533 U.S. at 693–94 (collecting cases setting forth this longstanding distinction); id. at

14  693 ("an alien who is detained shortly after unlawful entry cannot be said to have 'effected an

15  entry.'"). By expanding mandatory detention under § 1225(b)(2) only to "arriving" noncitizens"

16  within the context of inspection at borders and ports of entry, Congress respected the more robust

17  due process rights held by noncitizens already present in the country. As the Ninth Circuit

18  observed, "§ 1226(a) stands out from the other immigration detention provisions in key respects."

19  Rodriguez Diaz v. Garland, 53 F.4th 1189, 1202 (9th Cir. 2022) (noting that § 1226(a) and its

20  implementing regulations "provide extensive procedural protections that are unavailable under

21  other detention provisions."). The procedural protections for a detainee under § 1226(a) include

22  "an initial bond hearing before a neutral decisionmaker, the opportunity to be represented by

23  counsel and to present evidence, the right to appeal, and the right to seek a new hearing when

24  circumstances materially change." Id. None of these protections are available under § 1225. The

25  legislative history reflects that Congress intended the more robust protections under § 1226 to

26  apply to noncitizens present in the country, in recognition of their substantial liberty interest under

27  the Due Process Clause, while limiting mandatory detention under § 1225 to "arriving

28  noncitizens."

If, as Respondents contend, Congress's true intent in enacting IIRIRA was to exponentially expand immigration detention under the INA—such that millions of people currently living and working in the country would be confined—it would have said so more clearly within the amendments and legislative record. See Whitman v. Trucking Associations, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not one might say, hide elephants in mouseholes."). As another district court aptly posed, "[r]ealistically speaking, if Congress's intention was so clear, why did it take thirty years to notice?" Romero, 2025 WL 2403827, at *12.

Finally, the government's new reading of § 1225(b)(2) runs afoul of the presumption that Congress enacted a constitutional statute. By subjecting noncitizens like Petitioners to mandatory detention, despite their significant due process rights as individuals present in the U.S., with no consideration of their deep financial, community, and familial ties in the country, the government has proffered "an interpretation of a federal statute that engenders constitutional issues" despite the fact that a more "reasonable alternative interpretation" does not raise such constitutional questions. See Gomez v. U.S., 490 U.S. 858, 858 (1989); Zadvydas, 533 U.S. at 690 ("A statute permitting indefinite detention of an alien would raise a serious constitutional problem.") Thus, by collapsing the distinction between "aliens who have established connections in this country" and their greater due process rights as compared to an arriving noncitizen, i.e., "an alien at the threshold of initial entry," the government needlessly interprets § 1225(b)(2) in a manner that would render it unconstitutional. Thuraissigiam, 591 U.S. at 107 (finding that a noncitizen who was apprehended "just 25 yards from the border" in the process of trying to enter the country illegally was "at the threshold of initial entry" and thus subject to lesser due process rights in deportation proceedings than "aliens who have established connections in this country"). The Court therefore *must* reject the government's reading. Torres, 976 F.3d at 923 (the INA is to be read "against the backdrop of our constitutional principles") (citation omitted).

2.  Agency Practice

"[T]he longstanding practice of the government—like any other interpretive aid—can inform [a court's] determination of what the law is." Loper Bright, 603 U.S. at 386. The fact that

1    Respondents' reading is inconsistent with existing regulations governing IJs' bond jurisdiction, as

2    well as decades of agency practice, is further persuasive evidence that Petitioners and those

3    similarly situated continue to be subject to discretionary detention under § 1226(a). See, e.g., 8

4    C.F.R. § 1003.19(h)(2) (limiting an IJ's bond jurisdiction only over certain classes of noncitizens

5    such as *arriving* noncitizens and those encompassed under § 1226(c)). Likewise, Respondents'

6    reading of § 1225 is undermined by the fact that it vests immensely expanded detention authority

7    in DHS—a shift of "vast economic and political significance"—while contravening decades of

8    consistent agency practice applying § 1226(a) to noncitizens like Petitioners. See, e.g., Util. Air

9    Regul. Grp. V. EPA, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-

10   extant statute an unheralded power. . . [the courts] typically greet its announcement with a measure

11   of skepticism. We expect Congress to speak clearly if it wishes to assign to an agency decisions

12   of vast economic and political significance.")  (citations omitted).

13            Until the government adopted its new interpretation of § 1225(b)(2), for nearly three

14   decades since IIRIRA was enacted, the longstanding practice of the agencies charged with

15   interpreting and enforcing the INA applied § 1226(a) to noncitizens who entered the U.S. without

16   inspection and were apprehended while present in the U.S, in contrast to those apprehended at or

17   near a port of entry who could be designated as a so-called "arriving alien." The EOIR's

18   regulations drafted to implement the IIRIRA amendments explained this distinction. See

19   Inspection and Expedited Removal of Aliens, 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997) ("Despite

20   being applicants for admission, aliens who are present without having been admitted or paroled

21   (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond

22   redetermination . . . . The effect of this change is that inadmissible aliens, *except for arriving aliens*,

23   have available to them bond redetermination hearings before an immigration judge, while arriving

24   aliens do not. This procedure maintains the status quo . . .") (emphasis added). Consistent with that

25   distinction, the regulations define the term "arriving alien" as follows:

26            The term arriving alien means an applicant for admission coming or
             attempting to come into the United States at a port-of-entry, or an
27           alien seeking transit through the United States at a port-of-entry, or
             an alien interdicted in international or United States waters and
28           brought into the United States by any means, whether or not to a
             designated port-of-entry, and regardless of the means of transport.

8 C.F.R. § 1001.1. The Department of Justice first issued its current definition of "arriving alien" shortly after the enactment of IIRIRA. See 62 Fed. Reg. 10,312, 10,312 (Mar. 6, 1997). It explained that "[a]fter carefully considering [several statutory] references [to arriving aliens], the Department felt that the statute seemed to differentiate more clearly between aliens at ports-of-entry and those encountered elsewhere in the United States." Id. at 10,312–13. Accordingly in the decades since IIRIRA was enacted, DHS and the EOIR have applied § 1226(a) to the detention of individuals apprehended within the continental U.S. who entered without inspection and provided them access to release on bond, while § 1225(b) has been applied to "arriving" noncitizens apprehended at the border or in the process of crossing the border.

And as discussed above, Congress enacted the Laken Riley Act against this backdrop of longstanding agency practice applying § 1226(a) to inadmissible noncitizens already residing in the country. Another "customary interpretive tool" is the principle that "[w]hen Congress adopts a new law against the backdrop of a 'longstanding administrative construction,'" courts "generally presume the new provision should be understood to work in harmony with what has come before." Monsalvo Velazquez v. Bondi, 145 S.Ct. 1232, 1242 (2025) (quoting Haig v. Agee, 453 U.S. 280, 297–98 (1981)). In Monsalvo Velazquez, while recognizing that "[i]n truth, the statute is susceptible to both understandings," the Supreme Court interpreted a deadline expressed in terms of "days" in § 1229c of the INA to "extend deadlines falling on a weekend or legal holiday to the next business day," rather than counting "every calendar day." Id. at 1242. The Court adopted this interpretation because Congress enacted the relevant subsection "against the backdrop of [a] consistent, longstanding administrative construction" giving this specialized meaning to the term "day." Id. Similarly, here, Congress adopted the Laken Riley amendments to § 1226(c) against the backdrop of decades of post-IIRIRA agency practice applying discretionary detention under § 1226(a) to inadmissible noncitizens like Petitioners. It is therefore presumed that Congress intended "the same understanding" when it amended the INA this year. See id.

Even though the BIA's decision in Hurtado is inconsistent with decades of agency practice, Respondents assert the Court should afford it substantial weight under Skidmore v. Swift & Co, 323 U.S. 134 (1944). Under Skidmore, the weight to be afforded to an agency's interpretation by

a federal court depends "upon the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements." Skidmore, 323 U.S. at 140. The Court finds the BIA's reasoning in Hurtado is invalid for all the reasons discussed above. Moreover, Hurtado drastically departs from prior BIA precedent, without acknowledging that departure. Hurtado contradicts a BIA decision designated as precedential as recently as August of this year. See Matter of Akhmedov, 29 I. & N. Dec. 166 (BIA 2025) (stating unequivocally that a noncitizen who entered the country without inspection in January 2022 was detained pursuant to 8 U.S.C. § 1226(a)). Accordingly, this Court finds the BIA's new interpretation of § 1225(b)(2) in Hurtado is unpersuasive and should be afforded little weight under Skidmore. See also Murillo-Chavez v. Bondi, 128 F.4th 1076, 1087 (9th Cir. 2025) (noting that after Loper Bright, courts may only look to agency interpretation as persuasive and "may not defer to an agency interpretation of the law simply because a statute is ambiguous.") (citing Loper Bright, 603 U.S. at 413).

In sum, the Court finds that the text and canons of statutory interpretation, legislative history, and long history of consistent agency practice, demonstrate that Petitioners—who are each longtime U.S. residents, who were arrested and detained by ICE far from any port of entry—are subject to detention under § 1226(a) and its implementing regulations, not § 1225(b)(2)(A), and that the government's new interpretation and policy under that provision, is unlawful.[13]

**D. Due Process**

Petitioners also challenge their ongoing detention without the opportunity for release on bond as unconstitutional under the Due Process Clause of the Fifth Amendment. For the following reasons, the Court finds Petitioners are being detained without the opportunity for release on bond

---

[13] The Court is not persuaded by the minority of district courts that have adopted the government's new reading of 8 U.S.C. § 1225(b)(2). See, e.g., Pena v. Hyde, No. CV 25-11983-NMG, 2025 WL 2108913 (D. Mass. July 28, 2025); Chavez v. Noem, No. 3:25-CV-02325-CAB-SBC, 2025 WL 2730228 (S.D. Cal. Sept. 24, 2025); Vargas Lopez v. Trump, No. 8:25CV526, 2025 WL 2780351 (D. Neb. Sept. 30, 2025); Silva Oliveira v. Patterson, No. 6:25-CV-01463, 2025 WL 3095972 (W.D. La. Nov. 4, 2025); Mejia Olalde v. Noem, No. 1:25-CV-00168-JMD, 2025 WL 3131942 (E.D. Mo. Nov. 10, 2025). In each of those cases, the district courts did not meaningfully contend with the statutory text in accordance with canons of statutory construction, nor the legislative history, and longstanding agency practice as discussed above. And perhaps most importantly, they did not contend with the due process concerns that arise from detaining noncitizens like Petitioners, "who have established connections in this country," without the opportunity for release on bond. Thuraissigiam, 591 U.S. at 107.

1    in violation of their procedural and substantive due process rights.

2         The Due Process Clause prohibits deprivations of life, liberty, and property without due

3    process of law. U.S. CONST., amend. V. There is no question that these protections extend to

4    noncitizens present in the United States. See, e.g., Trump v. J.G.G., 604 U.S. _, 145 S. Ct. 1003,

5    1006 (2025) (per curiam) ("'It is well established that the Fifth Amendment entitles aliens to due

6    process of law' in the context of removal proceedings . . .") (quoting Reno v. Flores, 507 U.S. 292,

7    306 (1993)); Zadvydas v. Davis, 533 U.S. 678, 693, (2001) ("[T]he Due Process Clause applies to

8    all 'persons' within the United States, including aliens, whether their presence here is lawful,

9    unlawful, temporary, or permanent."); Hussain v. Rosen, 985 F.3d 634, 642 (9th Cir. 2021).

10        Noncitizen detainees charged with being in the U.S. illegally are entitled to procedural due

11   process, meaning "notice and opportunity to be heard appropriate to the nature of the case." J.G.G.,

12   145 S.Ct. at 1006 (internal quotation marks omitted); see also A. A. R. P. v. Trump, 145 S. Ct.

13   1364, 1367 (2025). "Procedural due process rules are meant to protect" against "the mistaken or

14   unjustified deprivation of life, liberty, or property." Id. (quoting Carey v. Piphus, 435 U.S. 247,

15   259 (1978.  Due process "is a flexible concept that varies with the particular situation." Zinermon

16   v. Burch, 494 U.S. 113, 127 (1990). "[T]he government's discretion to incarcerate non-citizens is

17   always constrained by the requirements of due process." Hernandez v. Sessions, 872 F.3d 976,

18   981 (9th Cir. 2017).

19        Substantive due process protects individuals from government action that interferes with

20   fundamental rights. See Regino v. Staley, 133 F.4th 951, 959-60 (9th Cir. 2025). "Governmental

21   action that infringes a fundamental right is constitutional only if 'the infringement is narrowly

22   tailored to serve a compelling state interest.'" Id. at 960 (citing Reno, 507 U.S. at 302). "Freedom

23   from imprisonment—from government custody, detention, or other forms of physical restraint—

24   lies at the heart of the liberty [the Due Process Clause] protects." Zadvydas, 533 U.S. at 690.

25   Substantive due process thus protects noncitizens from arbitrary confinement by the government,

26   which violates a noncitizen's substantive due process rights except in certain "special and narrow

27   nonpunitive circumstances where a special justification . . . outweighs the individual's

28   constitutionally protected interest in avoiding physical restraint." Id. at 690 (internal quotations

1  omitted) (quoting <u>Foucha v. Louisiana</u>, 504 U.S. 71, 80 (1992); <u>Kansas v. Hendricks</u>, 521 U.S.

2  346, 356 (1997)).

3       Even if the Court were to accept the government's new reading of § 1225(b)(2), it would

4  still be faced with Petitioners' due process challenge to their detention without the opportunity for

5  bond. Indeed, the Ninth Circuit has questioned the constitutionality of § 1225(b):

6
7
8
9
> We have grave doubts that any statute that allows for arbitrary
> prolonged detention without any process is constitutional or that
> those who founded our democracy precisely to protect against the
> government's arbitrary deprivation of liberty would have thought so.
> Arbitrary civil detention is not a feature of our American
> government.

10  <u>Rodriguez v. Marin</u>, 909 F.3d 252, 256–57 (9th Cir. 2018) (alteration in original). Yet Respondents

11  assert Petitioners' due process rights are not violated by their detention without the opportunity for

12  release on bond because the Supreme Court upheld detention without bond hearings under §

13  1226(c) in <u>Demore</u>. <u>See</u> ECF No. 15 at 17 (citing <u>Demore</u>, 538 U.S. at 522). But <u>Demore</u> does not

14  stand for that proposition.

15       In <u>Demore</u>, the Supreme Court held that "the Government may constitutionally detain

16  deportable aliens during the limited period necessary for their removal proceedings" where

17  mandatory detention under § 1226(c) applied to "a limited class of deportable aliens—including

18  those convicted of an aggravated felony." 538 U.S. at 518. This holding was based on the

19  government establishing a particular interest in detaining that limited class of noncitizens. <u>Id.</u> at

20  526. In <u>Demore</u>, the Court found "[s]uch detention necessarily serves the purpose of preventing

21  deportable criminal aliens from fleeing prior to or during their removal proceedings" based on

22  evidence before Congress when IIRIRA was enacted, demonstrating that noncitizens convicted of

23  certain crimes were statistically more likely to abscond from removal proceedings. <u>Id.</u> at 526-27.

24  That interest is not implicated in the continued detention of Petitioners, who have no criminal

25  convictions. And importantly, the Court found the detention without bond of a noncitizen satisfied

26  due process because his criminal convictions were "obtained following the full procedural

27  protections our criminal justice system offers." <u>Id.</u> at 513-14. <u>Demore</u> did not hold that mandatory

28  detention of noncitizens who do not fall into the limited class of noncitizens under § 1226(c)

1    satisfies due process, regardless of whether the government establishes they are dangerous or a

2    flight risk.

3         Respondents also cite to the Supreme Court's decision in <u>Thuraissigiam</u> and contend

4    noncitizens like Petitioners only have the due process rights "that Congress has provided by

5    statute." <u>Thuraissigiam</u>, 591 U.S. at 140. Thus, Respondents argue, if Congress subjects Petitioners

6    to mandatory detention under § 1225(b)(2), due process is satisfied. But <u>Thuraissigiam</u> held that a

7    petitioner who was stopped "*just 25 yards into U.S. territory*," <u>id.</u> at 105, did not have any due

8    process rights "regarding admission" into the United States beyond what Congress provided in the

9    INA, based on the "sovereign prerogative" of Congress to admit or exclude noncitizens. <u>Id.</u> at 139-

10   49 (citations omitted). <u>Thuraissigiam</u> did not, however, consider a noncitizen's due process rights

11   in the context of detention, regardless of where or when they are intercepted. <u>Id.</u> at 120-128 (noting

12   the legality of the petitioner's detention was not in question). Further, Respondents reliance on

13   <u>Thuraissigiam</u> directly contradicts the fact that the Supreme Court underscored in the case the

14   distinction that "aliens who have established connections in this country," like Petitioners, have

15   greater due process rights than "an alien at the threshold of initial entry." <u>Id.</u> at 107.

16        Respondents' reliance on <u>Thuraissigiam</u> further fails because, as discussed above,

17   Congress *has* afforded Petitioners due process rights to a bond hearing under § 1226(a), because

18   Petitioners are not "seeking initial entry" and thus subject to the sovereign prerogative as defined

19   in that case, and to the contrary, Petitioners hold greater due process rights because of their

20   "established connections in this country." <u>Id.</u> Moreover, contrary to Respondents arguments, the

21   Supreme Court has recently clarified, in accordance with longstanding precedent, that in the

22   context of removal proceedings—regardless of a whether a noncitizen is detained or not during

23   the pendency of those proceedings—"[T]he Fifth Amendment entitles aliens to due process of law

24   in the context of removal proceedings." <u>A. A. R. P. v. Trump</u>, 605 U.S. 91, 94-95 (2025) (citing

25   <u>Trump v. J. G. G.</u>, 604 U. S. ——,  145 S.Ct. 1003, 1006 (2025) (*per curiam*)) (quoting <u>The</u>

26   <u>Japanese Immigrant Case</u>, 189 U.S. 86, 101 (1903)).

27        In sum, Respondents' assertion that noncitizens like Petitioners have no constitutional due

28   process right to a hearing where the government must show it has an individualized purpose in

- 40 -

1    detaining them is utterly untenable under Supreme Court precedent. And other than the above
2    citations, Respondents fail to meaningfully address the procedural and substantive due process
3    rights of Petitioners and provide no individualized justification for their detention. The Court now
4    turns to the merits of Petitioners' procedural and substantive due process challenge.

5                            **1.  Procedural Due Process**

6        To determine whether detention violates procedural due process, courts apply the three-
7    part test set forth in Mathews v. Eldridge, 424 U.S. 319 (1976). See Rodriguez Diaz v. Garland,
8    53 F.4th 1189, 1203-07 (9th Cir. 2022) (collecting cases and applying the Mathews test in a similar
9    immigration detention context and holding "[u]ltimately, Mathews remains a flexible test that can
10   and must account for the heightened governmental interest in the immigration detention context").

11       Under Mathews, the courts weigh the following three factors: (1) "the private interest that
12   will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest
13   through the procedures used, and the probable value, if any, of additional or substitute procedural
14   safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and
15   administrative burdens that the additional or substitute procedural requirement would entail."
16   Mathews, 424 U.S. at 335.

17       The first Mathews factor considers the private interest affected by the government's
18   ongoing detention of Petitioners without the opportunity for release on bond. See Mathews, 424
19   U.S. at 335. Here, that is Petitioners' interest in being free from imprisonment, "the most elemental
20   of liberty interests." Hamdi, 542 U.S. at 529. In this country, liberty is the norm and detention "is
21   the carefully limited exception." United States v. Salerno, 481 U.S. 739, 755 (1987); see also
22   Rodriguez Diaz, 53 F.4th At 1207 ("An individual's private interest in freedom from prolonged
23   detention is unquestionably substantial.") (citations omitted).

24       Additionally, Petitioners' liberty interest is not diminished by any final order of removal,
25   or the availability of any existing process to challenge Respondents' decision to detain them
26   without bond. Cf. id. at 1208 (holding the habeas petitioner's liberty interest was diminished by
27   the fact that he was subject to a final order of removal, had already been afforded an individualized
28   bond hearing, and had additional process available to him through a further bonding hearing before

                                      - 41 -

1    an IJ upon a showing of materially changed circumstances).

2        Second, the Court considers "the risk of an erroneous deprivation of [Petitioners'] interest

3    through the procedures used, and the probable value, if any, of additional procedures." Mathews,

4    424 U.S. at 335. There are no existing procedures whatsoever for Petitioners to challenge their

5    detention pending the conclusion of their removal proceedings without the opportunity for release

6    on bond. The risk of erroneous deprivation is extraordinarily high where ICE and DHS agency

7    officials have sole, unguided, and unreviewable discretion to detain Petitioners without any

8    individualized showing of why their detention is warranted, nor any process for Petitioners to

9    challenge the exercise of that discretion. The likelihood of erroneous deprivation caused by this

10   lack of process is demonstrated by the fact that an IJ, who held a bond hearing for Petitioner

11   Escobar-Salgado prior to Hurtado, found that the government had not established a justification

12   for his detention. Likewise, given that Petitioners Mena-Vargas and Reyes-López have no criminal

13   convictions, have deep financial, familial, and community ties in the country, and that Respondents

14   have not asserted they are dangerous or a flight risk, it is very likely that they are being arbitrarily

15   and unjustifiably deprived of their liberty.

16       The additional procedures afforded under § 1226(a), including an individualized custody

17   redetermination by an immigration judge, i.e., a bond hearing, substantially mitigate the risk of

18   erroneous deprivation of Petitioners' liberty, because those procedures require the government to

19   establish that Petitioners present a flight risk or danger to the community. This would account for

20   the constitutional requirement that "once the flight risk justification evaporates, the only special

21   circumstance [ ] present is the alien's removable status itself, which bears no relation to a detainee's

22   dangerousness." Zadvydas, 553 U.S. at 691-92. An adverse decision by an immigration judge in a

23   bond hearing can further be appealed, and Petitioners could seek additional custody

24   redeterminations based on changed circumstances, such that the outcome of a bond hearing would

25   be subject to "numerous levels of review, each offering [Petitioners] the opportunity to be heard

26   by a neutral decisionmaker." Rodriguez Diaz, 53 F.4th at 1210 (finding the bond hearing

27   procedures available through the implementing regulations of § 1226(a) would render "the risk of

28   erroneous deprivation . . . relatively small.") (citation omitted). As such, the second Mathews

- 42 -

1   factor also weighs heavily in favor of granting Petitioners the procedural protections under §

2   1226(a).

3          The third and final <u>Mathews</u> factor considers the "Government's interest, including the

4   function involved and the fiscal and administrative burdens that the additional or substitute

5   procedural requirement would entail." 424 U.S. at 335. The Court acknowledges that the

6   government's interests in enforcing immigration laws, including "protecting the public from

7   dangerous criminal aliens" and "securing an alien's ultimate removal," are "interests of the highest

8   order." <u>Rodriguez Diaz</u>, 53 F.4th at 1188-89. These interests are in fact served by the

9   individualized determination by an immigration judge, based on a review of evidence presented

10  by the government and the noncitizen, as to whether an individual is dangerous or at risk of fleeing

11  removal proceedings, under existing, well-established procedures. In failing to articulate any

12  individualized reason why detaining Petitioners is necessary to enforce immigration law, the

13  question arises "whether the detention is not to facilitate deportation, or to protect against risk of

14  flight or dangerousness, but to incarcerate for other reasons." <u>Demore</u>, 538 U.S. at 532–33

15  (Kennedy, J. concurring). And the government has no interest in the unjustified deprivation of a

16  person's liberty.

17         Further, the Court finds that limiting the use of detention to only those noncitizens who are

18  dangerous or a flight risk through existing bond procedures serves the government and public's

19  interest by *reducing* the fiscal and administrative burdens attendant to immigration detention.

20  <u>Hernandez v. Sessions</u>, 872 F.3d 976, 996 (9th Cir. 2017) (Noting in 2017 that "the costs to the

21  public of immigration detention are staggering: $158 each day per detainee, amounting to a total

22  daily cost of $6.5 million. Supervised release programs cost much less by comparison: between 17

23  cents and 17 dollars each day per person.").

24         In sum, the Court finds the <u>Mathews</u> factors weigh heavily in factor of Petitioners, and

25  therefore, their detention without the opportunity for release on bond violates their procedural due

26  process rights.

27              **2.       Substantive Due Process**

28         Immigration detention violates the Due Process Clause unless it is ordered in a criminal

- 43 -

proceeding with adequate procedural protections, or in non-punitive circumstances "where a special justification . . . outweighs the individual's constitutionally protected interest in avoiding physical restraint." Zadvydas, 533 U.S. at 690.

Respondents have asserted no individualized justification—let alone a special or compelling justification—to continue to deprive Petitioners of their physical liberty. Such indifference from the executive branch to the Constitution's guarantee of freedom from arbitrary detention is grave cause for concern. Accordingly, in addition to finding that the challenged regulation violates procedural due process, this Court further finds that Petitioners are currently detained in violation of their substantive due process rights.

### E. Scope of Relief

The federal habeas corpus statute "does not limit the relief that may be granted to discharge of the applicant from physical custody." Carafas v. LaVallee, 391 U.S. 234, 238 (1968). "Its mandate is broad with respect to the relief that may be granted." Id. "It provides that '[t]he court shall . . . dispose of the matter as law and justice require.'" Id. (quoting 28 U.S.C. § 2243).

Here, Petitioner Escobar-Salgado faces the specific harm of being deprived of his opportunity to be released on bond, pursuant to IJ Baker's order, for several months. The Court finds this harm is remedied by his immediate release, subject to the bond conditions imposed by IJ Baker.

The specific harm faced by Petitioners Mena-Vargas and Reyes-López is their detention for months without a bond hearing pursuant to § 1226(a). The Court finds that harm is remedied by ordering a bond hearing within seven days. Given the due process rights at stake, if a bond hearing is not provided promptly within that time frame, Petitioners shall be immediately released until it is determined that their detention is warranted under 8 U.S.C. § 1226(a).

## VI.    CONCLUSION

Based on the foregoing **IT IS HEREBY ORDERED** that Petitioners' (ECF No. 1) Petition for Writ of Habeas Corpus is **GRANTED**.

Respondents are **ORDERED** to release Petitioner Escobar-Salgado from custody by **6:00**

1    **p.m. on November 17, 2025**.  Petitioner shall be subject to the bond and other conditions imposed

2    by the IJ. Petitioner shall have until **December 1, 2025** to satisfy the bond conditions. If he fails

3    to do so, he will be subject to rearrest and redetention under 8 U.S.C. § 1226(a).

4        Respondents are **FURTHER ORDERED** to provide Petitioners Mena-Vargas and Reyes-

5    López a bond hearing pursuant to 8 U.S.C. § 1226(a) by **November 24, 2025**.

6        **IT IS FURTHER ORDERED** that if an individualized bond hearing is not provided to

7    Petitioners Mena-Vargas and Reyes-López by **November 24, 2025.** If a bond hearing is not

8    provided by that date, they shall be released from ICE custody until it is determined that their

9    detention is warranted under 8 U.S.C. § 1226(a).

10        **IT IS FURTHER ORDERED** that Respondents are **ENJOINED** from denying

11    Petitioners the ability to be released on bond on the basis that they are subject to mandatory

12    detention under 8 U.S.C. § 1225(b)(2).

13        **IT IS FURTHER ORDERED** that the parties shall file a Joint Status Report on

14    **December 1, 2025** confirming compliance with this Order. The status report shall detail if and

15    when the ordered bond hearings occurred, if bond was granted or denied, and if denied, the reasons

16    for that denial.

17        **IT IS FURTHER ORDERED** that the Clerk of Court is instructed to enter judgment

18    accordingly and close this case.

19

20        **DATED:** November 17, 2025.

21

22        _____

23        **RICHARD F. BOULWARE, II**
      **UNITED STATES DISTRICT JUDGE**

24

25

26

27

28